**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No._____ / CIVIL DIVISION**

**01-7579**

**CIV-FERGUSON**
MAGISTRATE JUDGE
SNOW

|  |  |
|---|---|
| THE SCHOOL BOARD OF | ) |
| BROWARD COUNTY, FLORIDA, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| S. Z., A MINOR BY AND THROUGH HER | ) |
| PARENT, M.Z. | ) |
| Defendant, | ) |



### COMPLAINT

Plaintiff, THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA, (hereinafter

referred to as THE SCHOOL BOARD") hereby files this Complaint against Defendants "S.Z.",

by and through her parent, M.Z. ("Mother") and pleads and alleges the following:

### JURISDICTION AND VENUE

1.     This case arises under the Individuals with Disabilities Education Act, 20 U.S.C.

§1400 et seq. (IDEA).  Thus, this court has subject matter jurisdiction pursuant to 20 U.S.C. §

1415(e) (2) of IDEA, 28 U.S.C. §§1331 and 1332, and Florida Administrative Code, Section 6A-

6.03311(5) (d).

2.     Since all events occurred with the jurisdictional reach of this Court, venue is

proper pursuant to 28 U.S.C. §1391.

**PARTIES**

3.     Plaintiff, THE SCHOOL BOARD, is a body corporate and governmental agency duly empowered by the Constitution and statutes of the State of Florida to administer, manage, and operate public schools, within Broward County, State of Florida.

4.     Defendant, S.Z., is a resident of Broward County, Florida.

5.     Mother, M.Z., is a resident of Broward County, Florida.

6.     All conditions precedent to bringing this action have been performed, satisfied, or waived.

**FACTUAL BACKGROUND**

7.     At the time of the hearing, S.Z, was a 13 year old female born December 12, 1987, and was a fifth grader at Panther Run Elementary School, in the Broward County public schools, during the 2000-2001 school year.

8.     S.Z. is an exceptional student and falls within the definition of "children with disabilities," as defined by the Individuals with Disabilities Education Act (IDEA).

9.     S.Z.'s Exceptional Student Education (ESE) program eligibility is Educably Mentally Handicapped (EMH), speech and language therapy, and occupational therapy.

10.     On September 18, 2000, the parties held a meeting to develop Defendant's Individualized Education Program (IEP) for the 2000-2001 school year at Panther Run Elementary School.

11.     Persons in attendance at the September 18, 2000 meeting included Defendant's mother; the ESE specialist; the general education teacher; the curriculum supervisor for Plaintiff; the occupational therapist; the evaluation specialist, who was also the speech and language pathologist; the reading specialist; and the guidance counselor.

12.     The 2000-2001 IEP indicated that the desired outcome was for Defendant to acquire living skills, academic skills, and social skills in the least restrictive environment.

13.     For the 2000-2001 IEP, a determination was made that Defendant would be placed in the regular classroom and indicated that Defendant's participation in the regular classroom was to provide "access to general educational curriculum with homogenous grouping for reading, math and assistance for majority of learning activities" at 100 percent of the time.

14.     Defendant's mother did not object to the annual goals or the short-term objectives of the Defendant's IEP at the initial IEP meeting or at any of the subsequent interim review meetings.

15.     The September 18, 2000 IEP was reasonably calculated to, and did in fact, offer S.Z. access to a free appropriate public education (FAPE) under IDEA and all applicable Florida laws.

16.     To the extent that the IEP contains any defect or omission, such defect or omission was not the proximate cause of any educational harm, was unintentional, and was immaterial to S.Z.'s access to FAPE.

17.     S.Z. received academic benefit as a result of her attendance at Panther Run Elementary School during the relevant time period.

18.     THE SCHOOL BOARD has complied or substantially complied with the substance and intent of the procedures and procedural safeguards contained in IDEA as well as the relevant state statutes and regulations.

19.     THE SCHOOL BOARD provided S.Z. with adequate educational services during the 2000-2001 school year in furtherance of her IEP's goals and objectives.

3

20.     During the 2000-2001 school year THE SCHOOL BOARD delivered and S.Z. received a free and appropriate public education in furtherance of and by implementation of her IEP.

21.     The implementation of the IEP by THE SCHOOL BOARD conferred upon, and S.Z received, some educational benefit from her education in Broward County's public schools.

22.     On October 11, 2000, S.Z, by and through her counsel, requested a due process hearing regarding whether Defendant was receiving a FAPE from THE SCHOOL BOARD.

23.     On October 23, 2000, this matter was referred to the Florida Division of Administrative Hearings and a proceeding entitled <u>S.Z  v. BROWARD COUNTY SCHOOL BOARD</u>, (Division Administrative Hearings, State of Florida, (DOAH) Case No. 00-4344E, was initiated.  Said hearing was concluded with the filing of a Final Order therein on September 6, 2001.

24.     THE SCHOOL BOARD, is a party aggrieved by the proceedings of the administrative hearing and the said Final Order.

25.     THE SCHOOL BOARD files this civil action as provided for by the aforementioned statutes and regulations, seeks a new trial *de novo* of all matters, and seeks the opportunity to present additional evidence that was not presented during the administrative hearing.

## <u>CONFIDENTIALITY</u>

26.     Sections 230.23 (4) (m) (5), Fla. Stat.,  provides that "…any records created as a result of such hearing shall be confidential and exempt for the provisions of s.119.07 (1) to the extent that the State Board adopts rules establishing other procedures."

4

27.     This matter pertains to the education of a minor child by THE SCHOOL BOARD and otherwise deals with confidential matters.

28.     In furtherance thereof, THE SCHOOL BOARD has referred to the identities of the individuals involved herein by use of initials and will make a motion hereafter to assure the confidentiality of the subject matter of this cause.

## COUNT I

29.     Plaintiff repeats and realleges paragraphs 1 through 28 as if fully set forth herein verbatim.

30.     This is an action brought by THE SCHOOL BOARD as a party aggrieved by the Final Order and by the findings and conclusions rendered therein by the Administrative Law Judge of DOAH, all pursuant to the statute and regulations described above and all other applicable state and federal statutory and substantive law.

31.     During the fifth grade year, S.Z made some academic progress and received some educational benefit from THE SCHOOL BOARD.

32.     At all times relevant during the 2000-2001 school year, THE SCHOOL BOARD observed and re-evaluated S.Z in the classroom at Panther Run Elementary School, and did develop, modify and implement an IEP for S.Z.  These attempts were a work in progress as of October 11, 2000, when S.Z, by and through her counsel, requested a due process hearing under IDEA and Florida Administrative Code 6A-603311(5).

33.     THE SCHOOL BOARD has made a good faith effort to implement the IEP for S.Z.

34.     Solely as a result of the foregoing, THE SCHOOL BOARD seeks a declaration and judgment from this Honorable District Court that declares that THE SCHOOL BOARD has

provided S.Z access to a free and appropriate public education, that declares that THE SCHOOL BOARD has delivered and that S.Z has received some educational benefit, and declares that the September 18, 2000 IEP was proper and appropriate.

35.     In furtherance thereof, THE SCHOOL BOARD seeks an order vacating the Final Order of the Division of Administrative Hearings referred to above and superseding and replacing same with the order and judgment of this Honorable District Court that adopts the aforesaid assertions of the Plaintiff THE SCHOOL BOARD.

WHEREFORE Plaintiff, THE SCHOOL BOARD OF BROWARD COUNTY, FLORIDA, respectfully requests judgment against Defendants S.Z. and M.Z., as parent of the subject minor child, declaring that THE SCHOOL BOARD provided a free and appropriate public education to S.Z., in a manner that conferred some educational benefit to S.Z., that finds that the IEPs were appropriate, that vacates and replaces the Final Order of the Division of Administrative Hearings, dated September 6, 2001, and that grants such other and further relief in favor of the Plaintiff in this cause that is just and proper.

## VERIFICATION OF COMPLAINT

Leah A. Kelly, Director, Exceptional Student Education for The School Board of Broward County, Florida, hereby verifies that she has read the Complaint filed in the above-captioned cause and that every statement contained therein is true and correct to the best of her knowledge, except as to any matters that are stated on information and belief, and as to those matters she is informed and believes them to be true.

The above is given under penalty or perjury under the laws of the State of Florida.

_Leah A. Kelly_

LEAH A. KELLY, DIRECTOR
Exceptional Student Education.

6

STATE OF FLORIDA
COUNTY OF BROWARD

The foregoing instrument was acknowledged before me this 9th day of October, 2001, by Leah Kelly, Director of Exceptional Student Education, on behalf of The School Board of Broward County, Florida. She took an oath and is personally known to me or has produced _____N/A_____ as identification.

My Commission expires:

(SEAL)

_____
Signature - Notary Public

My Commission Expires:

_____
Printed Name of Notary

Respectfully submitted, this 9th day of October, 2001.

OFFICE OF THE SCHOOL BOARD
ATTORNEY
Attorneys for Respondent
K.C. Wright Administration Building
600 Southeast Third Avenue - 11th Floor
Fort Lauderdale, Florida 33301
Telephone:(954) 765-8866
Facsimile:(954) 768-8616

MARYLIN BATISTA-McNAMARA
Florida Bar No. 0998257

By: _____
EDWARD J. MARKO
Florida Bar No. 050447

Staff\jblackwell\allwork\doah\ese\zamir\appeal\complaint

7

STATE OF FLORIDA
DIVISION OF ADMINISTRATIVE HEARINGS

S. Z.,                          )
                                )
      Petitioner,               )
                                )
vs.                             )     Case No. 00-4344E
                                )
BROWARD COUNTY SCHOOL BOARD,    )
                                )
      Respondent.               )
_____ )

## FINAL ORDER

Pursuant to notice, a formal hearing was held in this case on April 16-18, and June 18, 2001, in Fort Lauderdale, Florida, before Errol H. Powell, a designated Administrative Law Judge of the Division of Administrative Hearings.

## APPEARANCES

      For Petitioner:   Stephen M. Teplin, Esquire
                        Alexis Yarbrough, Esquire
                        110 Southeast Sixth Street, 15th Floor
                        Fort Lauderdale, Florida  33301

      For Respondent:   Edward J. Marko, Esquire
                        Broward County School Board
                        600 Southeast Third Avenue, 11th Floor
                        Fort Lauderdale, Florida  33301

## STATEMENT OF THE ISSUES

The issues for determination are whether Respondent has provided Petitioner with a free appropriate public education (FAPE) including, whether Respondent provided Petitioner with an adequate Individualized Education Program (IEP); whether

Respondent included Petitioner in all of the regular classroom activities, and, if not, whether Respondent provided an explanation for the exclusion from all of the regular classroom activities; whether Respondent provided objective reports of Petitioner's progress; whether Respondent notified Petitioner's mother of Petitioner's progress; and whether Respondent implemented adequate assistive technology.

## PRELIMINARY STATEMENT

By letter dated October 11, 2000, S. Z. (Petitioner), by and through her counsel, requested a due process hearing regarding whether Petitioner was receiving a FAPE from the School Board of Broward County (Respondent).  In addition to the FAPE issue, Petitioner listed 11 issues associated with the FAPE issue.  On October 23, 2000, this matter was referred to the Division of Administrative Hearings.

By Order dated November 2, 2000, the 45-day decision requirement was extended.  Subsequently, the issues for hearing were narrowed.

At hearing, Petitioner presented the testimony of six witnesses and entered one exhibit (Petitioner's Exhibit numbered 7) into evidence.  Respondent presented the testimony of eight witnesses and entered one exhibit (Respondent's Exhibit numbered 4) into evidence.  The parties entered 16 joint exhibits (Joint Exhibits numbered 1-5 and 5A-15) into evidence.

2

Additionally, at hearing, a motion in limine, filed by Respondent, was argued.  The undersigned ruled that reading and reading comprehension were not at issue and that, therefore, no testimony regarding reading and reading comprehension would be permitted.

A transcript of the hearing was ordered.  The time for filing post-hearing submissions was set for more than ten days following the filing of the transcript.  The Transcript, consisting of four volumes, was filed on June 20, 2001, and July 6, 2001.  The parties timely filed post-hearing submissions which have been considered in the preparation of this Final Order.

### FINDINGS OF FACT

1.  Petitioner has Down Syndrome and is classified as Educably Mentally Handicapped (EMH).  The parties do not dispute that Petitioner is an exceptional student and falls within the definition of "children with disabilities," as defined by the Individuals with Disabilities Education Act (IDEA).  Her exceptional student education (ESE) program eligibility is EMH, speech and language therapy, and occupational therapy.

2.  At the time of the hearing, Petitioner was 13 years of age and was a fifth grader at Panther Run Elementary School in Respondent's district.  In 1999, at a chronological age of 11 years, Petitioner's age equivalent was determined to be 5.2 years

3

and she was demonstrating abilities at the moderate to mild
ranges of mental deficiency.

3.  Petitioner has attended schools in Respondent's district
since she was five years of age.  She attended Panther Run
Elementary School during the 1999-2000 and 2000-2001 school
years.

Petitioner's IEP[1]

4.  On September 18, 2000, a meeting was held to develop
Petitioner's IEP for the 2000-2001 school year at Panther Run
Elementary.  Persons in attendance at the IEP meeting included
Petitioner's mother; the ESE specialist; the general education
teacher; the curriculum supervisor for Respondent; the
occupational therapist; the evaluation specialist, who was also
the speech and language pathologist; the reading specialist; the
principal; the ESE teacher; the program specialist; and the
guidance counselor.

5.  The 2000-2001 IEP indicated that the desired outcome was
for Petitioner to acquire living skills, academic skills, and
social skills in the least restrictive environment.

6.  For the 2000-2001 IEP, a determination was made that
Petitioner would be placed in the regular classroom, with more
than 79 percent non-ESE students.  The IEP indicated that
Petitioner's participation in the regular classroom was to
provide "access to general education curriculum with homogenous

grouping for reading and math and assistance for majority of learning activities" at 100 percent of the time.

7. The IEP further indicated annual goals and short-term instructional objectives, including, among other things, (a) the criteria and the evaluation procedures to determine the mastery, and (b) the identification of the implementors and the persons responsible for documenting Petitioner's mastery of the short-term objectives. Mastery of an objective on the IEP is an indication that progress has been made.

8. Additionally, the IEP included a comment sheet which provided that additional software would be utilized to provide Petitioner with greater access to the computer and that an assistive technology referral would be made. Furthermore, the IEP included an accommodation sheet, which indicated the accommodations to be used and indicated that the accommodations would address how the curriculum would be presented, practiced, and assessed.

9. The 2000-2001 IEP also indicated that, during the duration of the IEP, the priority educational needs of Petitioner were improving Petitioner's academic skills, social skills, and self-help skills.

10. On September 25, 2000, an interim review was held. The persons in attendance included Petitioner's mother; the ESE specialist; the general education teacher; and the ESE teacher,

who was also the evaluation specialist.  At the interim staffing, a decision was made to continue with an independent functioning annual goal from the previous year's IEP and to add another goal, with short-term objectives, of Petitioner recognizing the date and month.

11.  On October 25, 2000, another interim review was held and the persons in attendance included Petitioner's mother; the ESE specialist; the general education teacher; the ESE teacher, who was also the reading specialist; the evaluation specialist; and the assistant principal.  At the interim review, among the items discussed were Petitioner's support facilitation (supplementary aids and services), language therapy (special education services), occupational therapy (related services), and accommodations needed to access the general education curriculum. Among other things, a determination was made to place Petitioner in a regular education classroom for the aforementioned services and for her participation with homogeneous grouping to be 100 percent of the time.  Additionally, a re-evaluation plan to begin an assistive technology referral was developed.

12.  Further interim reviews were held in January, February, and March 2001, regarding Petitioner's reading instruction and reading remediation plan.  Reading and reading comprehension are not at issue.

13. All the parties are in agreement that Petitioner will not be on the same level of the other students or that Petitioner will learn the same amount of material as the other students.

14. However, Petitioner should be provided the same opportunity to learn as the other students and have the same access to the same information as the other students.

15. An inference is drawn that Respondent's employees, who were and are working with Petitioner, have pre-determined that Petitioner's level of achievement and learning abilities will only reach a certain point and will not go beyond that point. To them, it does not matter that Petitioner has progressed to the fifth grade, she will not comprehend fifth-grade material even with accommodations or modifications. Consequently, to Respondent's employees, attempts to present fifth-grade material to Petitioner will not assist Petitioner in progressing.

16. Respondent relied upon the Woodcock-Johnson Test, as a tool, to ascertain a formal assessment of Petitioner. However, the Woodcock-Johnson Test fails to provide adequate information as to what Petitioner could do and alone it, therefore, fails to provide Respondent with sufficient information needed for the purpose of preparing an IEP for Petitioner.

17. Petitioner's IEP for the 2000-2001 school year included nine annual goals and 35 short-term objectives. Eleven of the 35

short-term objectives were repeated from previous years' IEPs in that the realms of instruction and areas of learning were targeted.

18.  All the parties agree that the general education curriculum is the beginning point for all students, including Petitioner.  The IEP should be built around the general education curriculum, not the general education curriculum built around the IEP.[2]

19.  Petitioner's 2000-2001 IEP fails to address the material that Petitioner, as a fifth grader, is expected to learn.  Even though the fifth-grade general education teacher attended the IEP meeting, she had no input into the goals and objectives of the IEP.

20.  Petitioner's 2000-2001 IEP does not incorporate the fifth-grade curriculum and it does not appear that the curriculum was taken into consideration.  Health, science, and social studies are fifth-grade subjects, but they are not addressed in the IEP.  The annual goal of applying time and money concepts is not relevant to the fifth grade general education curriculum; however, they are relevant to Petitioner's individualized needs and are, therefore, appropriate for Petitioner's IEP.  The short-term objectives for this annual goal had very little to do with time and money concepts on the fifth-grade level.  The annual goals of Petitioner developing a system to plan daily

8

assignments and seeking assurance from the teacher are not academic/educational priorities; however, they are individualized to Petitioner's needs and are, therefore, appropriate for her IEP.  The annual goal of identifying ordinal positions is not an academic/educational priority; however, it is individualized to Petitioner's needs and is, therefore, appropriate for Petitioner's IEP.  The goals of improving written communication skills on a computer and functional life skills are too general and need to be more specific to meet Petitioner's individualized needs.

21.  The 2000-2001 IEP provides for some subjective, informal evaluations by teachers.  Such evaluations, in and of themselves, are not inappropriate.

22.  Short-term objectives need criterion for mastery and evaluation procedures.  As previously found, mastery of an objective on an IEP is an indication that progress has been made. Some of the short-term objectives in Petitioner's 2000-2001 IEP failed to indicate the criterion for mastery and/or evaluation procedures.  For the annual goal of increasing reading comprehension, the short-term objective of sharing a book report with the class lacked the criterion for mastery and the short-term objective of increasing reading fluency lacked an evaluation procedure.  For the annual goal of applying time and money concepts, the short-term objective identifying time though the

9

quarter hour and counting nickels to a dollar lacked the criterion for mastery.  For the annual goal of developing a system to plan daily assignments, the short-term objectives of copying assignments from teacher provided roll and putting assignments in a planner lacked both criterion for mastery and evaluation procedures.

23.  Respondent should consider goals other than academic goals in developing Petitioner's IEP.[3]  The same information available at hearing was available at the IEP meeting on September 18, 2000, and such goals should have been considered at that meeting.

24.  No evidence was presented to demonstrate that Petitioner's mother objected to the annual goals or the short-term objectives of Petitioner's IEP at the initial IEP meeting or at subsequent interim review meetings.

Petitioner's Inclusion in the Regular Education Classroom[4]

25.  Petitioner's 2000-2001 IEP indicates that Petitioner was to be placed in the regular education class (more than 79 percent non-ESE students) 100 percent of the time.  Her placement complied with the IEP.

26.  The IDEA contemplates inclusion to consist of not only physical presence in the regular education class, but also at the social level, the activity level, the content level, and an extra-class level.  Even though Petitioner was physically located

in the general classroom, inclusion was not at the other aforementioned levels for most of the school day.

27.  As to the social level, Petitioner was well-liked and accepted by her classmates.  Petitioner and her classmates have engaged in informal social contact.  However, for an extended part of the school day, Petitioner was seated apart from the rest of the class.  As a result, Petitioner was provided with only limited opportunities to interact socially with her classmates.

28.  Regarding the activity level, Petitioner was mostly involved in separate activities, not activities with her classmates.  Usually, Petitioner was involved in one subject, whereas her classmates, at the same time, were involved in a different subject.

29.  As to the content level, Petitioner was not provided access to the same fifth-grade general education curriculum as her classmates.  Her general education teacher gave Petitioner a combination of second grade and fifth-grade curriculum.  Petitioner was consistently working on a different curriculum than her classmates.

30.  Regarding the extra-class level, interaction was very limited.

31.  For inclusion to take place, Petitioner must be afforded an opportunity to participate in or have access to the same fifth-grade activities and materials as her classmates in

order to determine what accommodations or modifications to the fifth grade curriculum are to be made. One observation of Petitioner in her fifth-grade class revealed that Petitioner's teacher made an accommodation or modification in the math subject matter for that class day. Inclusion entails participation by Petitioner in all the subject areas as her classmates to determine what accommodations or modifications need to be made to the fifth-grade curriculum.

### Objective Progress Reports and Notification of Progress

32. Petitioner's mother saw no progress as to Petitioner's academic ability during the 2000-2001 school year.

33. Petitioner's IEP indicated that reports on Petitioner's progress towards her annual goals would be provided in conjunction with Petitioner's report card.

34. Petitioner's mother received a report card/progress report and IEP annual goals progress report from Panther Run Elementary School during the first quarter of the 2000-2001 school year.

35. During the second quarter, Petitioner's mother received a report card indicating that Petitioner received A's in four subject areas taught at the school. Furthermore, the report card contained a question mark for the subject areas of reading and language arts.

36.   During the quarters, Petitioner constantly brought home the same homework, mainly consisting of spelling homework.

37.   Moreover, no graded homework, tests, quizzes, or graded reports had been given to Petitioner's mother.  Concerned about not having received any of these graded materials and not knowing from where or how Petitioner's grades were being obtained, Petitioner's mother inquired about how Petitioner's grades were obtained.

38.   Respondent informed Petitioner's mother that Petitioner's grades were obtained from the IEP goals, second and fifth-grade curriculum, and workbook.

39.   However, according to Petitioner's general education teacher, Petitioner's report card does not reflect her progress on her IEP goals and objectives.

40.   The IEP annual goals progress report developed by Respondent was a form report.  The report addressed progress on annual goals and was for terms, which referred to the marking period of the extended school year, with numerical numbers indicating the extent of progress.  The report also included, among other things, a comment section for each term.

41.   Petitioner's IEP annual goals progress reports received by Petitioner's mother listed each of Petitioner's nine annual goals of her IEP.  The reports covered two terms and for each term, Respondent indicated that Petitioner had obtained a "2,"

13

which indicated that "some progress made; anticipate meeting goal by IEP end."  No comments were included.

42.  Respondent's usual practice regarding sending documentation to the home of a disabled child is that the IEP implementers bring documentation, showing mastery of the goals and objectives to the annual IEP review.  Unless requested, the documentation is not sent home.  No evidence was presented to demonstrate that Respondent informed Petitioner's mother of this practice.

43.  Petitioner's mother had no knowledge of the kind of progress being referred to in the IEP annual goals progress reports since she was not aware of any graded homework regarding the IEP goals and objectives.

44.  Moreover, no evaluation of Petitioner's mastery of any of the annual goals or short-term objectives was made by Petitioner's general education teacher.

45.  Furthermore, neither Petitioner's speech pathologist nor her occupational therapist provided Petitioner's mother with updates on Petitioner's progress.  No work samples completed with Petitioner by the speech pathologist were provided to Petitioner's mother.  No therapy notes of Petitioner's progress by Petitioner's occupational therapist were provided to Petitioner's mother.

46. Petitioner's IEP indicates that documented teacher observations would serve as the evaluation of Petitioner's progress. However, no documented observations were prepared by Petitioner's general education teacher; and no written observations of Petitioner's progress were made by Petitioner's speech pathologist and teacher's aide.

47. Further, regarding Petitioner's written communication skills on the computer, according to Petitioner's occupational therapist, Petitioner met two of the four short-term objectives.

<u>Implementation of Adequate Assistive Technology</u>

48. Assistive technology is necessary to meet the goals and objectives of Petitioner's IEP.

49. At the initial IEP meeting on September 18, 2000, for Petitioner's 2000-2001 IEP, assistive technology for Petitioner was addressed. Petitioner's mother requested an assistive technology referral.

50. In requesting the referral, Petitioner's mother wanted a re-evaluation of Petitioner's ability and was attempting to promote some type of progress or growth. Petitioner was using the same software that she had used for a number of years, and Petitioner's mother felt that Petitioner had outgrown the software.

51. Petitioner's mother also requested a list of computer programs that Petitioner was using in the classroom. Respondent

15

failed to provide such a list and no reasonable explanation was
provided for its failure.

52.   Respondent has an Assistive Technology Referral Form.
The Form indicates, among other things, a procedural checklist,
with three levels--Level 1, Level 2, and Level 3.  Level 1 refers
to the development and review of the school-based "MDT
Intervention Plan."  Level 2 refers to contact with the "Area ESE
Program Specialist" for additional recommendations and provides
for the Program Specialist to initial this level.  Level 3 refers
to forwarding of the "Assistive Technology" referral to the "Area
AT Specialist."

53.   As to Level 1, the initial level, the Assistive
Technology Referral Form for Petitioner indicates that the
development of the Intervention Plan occurred on November 17,
2000, which was two months after the request by Petitioner's
mother.  The Form further indicates that the review of the
Intervention Plan occurred almost one month later on December 12,
2000.

54.   As to Level 2, the Assistive Technology Referral Form
for Petitioner indicates that Level 2 occurred on January 9,
2001, which was almost two months after the development of the
Intervention Plan.

55.   As to Level 3, the Assistive Technology Referral Form
for Petitioner indicates that Level 3 occurred on March 13, 2001,

which was two months after the contact with the Area ESE Program
Specialist for additional comments.

56.   No reasonable or adequate reason was presented by
Respondent as to why there was a delay in the assistive
technology referral.

57.   Evidence was insufficient to demonstrate that in-
service training was required for Respondent's teachers.

<u>CONCLUSIONS OF LAW</u>

58.   The Division of Administrative Hearings has
jurisdiction of these proceedings and the parties thereto
pursuant to Subsection 230.23(4)(m), Florida Statutes.

59.   Subsection 230.23(4)(m) provides, among other things,
that the School Board shall "Provide for an appropriate program
of special instruction, facilities, and services for exceptional
students . . . "

60.   States must comply with the IDEA in order to receive
federal funding for the education of handicapped children.   The
IDEA requires states to establish policy which assures that
children with disabilities will receive a FAPE.   Through an IEP,
the educational program accounts for the needs of each disabled
child.

61.   Definitions applicable to the IDEA are set forth at
20 U.S.C. Section 1401.   "Free appropriate public education" is
defined as follows:

>   (8)   The term 'free appropriate public
>   education' means special education and
>   related services that--
>   (A)   have been provided at public expense,
>   under public supervision and direction,
>   without charge;
>   (B)   meet the standards of the State
>   educational agency;
>   (C)   include an appropriate preschool,
>   elementary, or secondary school education in
>   the State involved; and
>   (D)   are provided in conformity with the
>   individualized education program . . . .

"Special education" is defined as follows:

>   (25)   The term 'special education' means
>   specially designed instruction, at no cost to
>   parents, to meet the unique needs of a child
>   with a disability including--
>   (A)   instruction conducted in the classroom,
>   in the home, in hospitals and institutions,
>   and in other settings; and
>   (B)   instruction in physical education.

"Assistive technology service" is defined as follows:

>   (2)   Assistive technology service
>   The term "assistive technology service" means
>   any service that directly assists a child
>   with a disability in the selection,
>   acquisition, or use of an assistive
>   technology device. Such term includes--
>   (A)   the evaluation of the needs of such
>   child, including a functional evaluation of
>   the child in the child's customary
>   environment;
>   (B)   purchasing, leasing, or otherwise
>   providing for the acquisition of assistive
>   technology devices by such child;
>   (C)   selecting, designing, fitting,
>   customizing, adapting, applying, maintaining,
>   repairing, or replacing of assistive
>   technology devices;
>   (D)   coordinating and using other therapies,
>   interventions, or services with assistive
>   technology devices, such as those associated

with existing education and rehabilitation
plans and programs;
(E)  training or technical assistance for
such child, or, where appropriate, the family
of such child; and
(F)  training or technical assistance for
professionals (including individuals
providing education and rehabilitation
services), employers, or other individuals
who provide services to, employ, or are
otherwise substantially involved in the major
life functions of such child.

62.  A state meets the IDEA's requirement of a FAPE when it

provides personalized instruction with sufficient support

services to permit the disabled child to benefit educationally

from that instruction.  The instruction and services must be

provided at public expense, meet the state's educational

standards, approximate grade levels used in the state's regular

education, and correspond to the disabled child's IEP.  Board of

Education of Hendrick Hudson Central School District v. Rowley,

102 S.Ct. 3034 (1982).

63.  Inquiry in cases involving compliance with the IDEA,

which is a de novo inquiry, is twofold:  (1) whether there has

been compliance with the procedural requirements of the IDEA,

including the creation of the IEP, and (2) whether the IEP

developed is reasonably calculated to enable the child to receive

educational benefits.  Rowley, at 3051.

64.  A state is not required to maximize the potential of a

disabled child commensurate with the opportunity provided to a

19

non-disabled child.   Rather, the IEP developed for a disabled
child must be reasonably calculated to enable the child to
receive educational benefits.  <u>Rowley</u>, at 3048-3049.   The
disabled child must be making measurable and adequate gains in
the classroom, but more than <u>de</u> <u>minimus</u> gains.  <u>J.S.K. v. Hendry</u>
<u>County School Board</u>, 941 F.2d 1563 (11th Cir. 1991); <u>Doe v.</u>
<u>Alabama State Department of Education</u>, 915 F.2d 651 (11th Cir.
1990).  The unique educational needs of the particular child in
question must be met by the IEP.  <u>Todd D. v. Andrews</u>, 933 F.2d
1576 (11th Cir. 1991)  "The importance of the development of the
IEP to meet the individualized needs of the handicapped child
cannot be underestimated." <u>Greer v. Rome City School District</u>,
950 F.2d 668, 695 (11th Cir. 1991).

   65.  The disabled child's education must be provided in the
least restrictive environment available.   A determination of such
environment requires consideration of whether there has been
compliance with the procedural requirements of the IDEA and
whether the IEP is reasonably calculated to enable the child to
receive educational benefits.  <u>DeVries v. Fairfax County School</u>
<u>Board</u>, 882 F.2d 876 (4th Cir. 1989).

   66.  Regarding the IEP, 20 U.S.C. Section 1414 provides in
pertinent part:

(d)  Individualized education programs

(1)   Definitions
As used in this chapter:
(A)   Individualized education program
The term "individualized education program"
or "IEP" means a written statement for each
child with a disability that is developed,
reviewed, and revised in accordance with this
section and that includes--

(i)  a statement of the child's present
levels of educational performance, including-
(I)  how the child's disability affects the
child's involvement and progress in the
general curriculum; or
(II)  for preschool children, as appropriate,
how the disability affects the child's
participation in appropriate activities;

(ii)  a statement of measurable annual goals,
including benchmarks or short-term
objectives, related to--
(I)  meeting the child's needs that result
from the child's disability to enable the
child to be involved in and progress in the
general curriculum; and
(II)  meeting each of the child's other
educational needs that result from the
child's disability;

(iii)  a statement of the special education
and related services and supplementary aids
and services to be provided to the child, or
on behalf of the child, and a statement of
the program modifications or supports for
school personnel that will be provided for
the child--
(I)  to advance appropriately toward
attaining the annual goals;
(II)  to be involved and progress in the
general curriculum in accordance with clause
(i)  and to participate in extracurricular
and other nonacademic activities; and

(III)  to be educated and participate with other children with disabilities and nondisabled children in the activities described in this paragraph;

(iv)  an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in clause (iii);

(v)(I)  a statement of any individual modifications in the administration of State or districtwide assessments of student achievement that are needed in order for the child to participate in such assessment; and
(II)  if the IEP Team determines that the child will not participate in a particular State or districtwide assessment of student achievement (or part of such an assessment), a statement of--
(aa)  why that assessment is not appropriate for the child; and
(bb)  how the child will be assessed;
(vi)  the projected date for the beginning of the services and modifications described in clause (iii), and the anticipated frequency, location, and duration of those services and modifications;

*    *    *

(viii)  a statement of--
(I)  how the child's progress toward the annual goals described in clause (ii) will be measured; and
(II)  how the child's parents will be regularly informed (by such means as periodic report cards), at least as often as parents are informed of their nondisabled children's progress, of--
(aa)  their child's progress toward the annual goals described in clause (ii); and
(bb)  the extent to which that progress is sufficient to enable the child to achieve the goals by the end of the year.

67. The first part of the twofold inquiry stated in Rowley,
supra, is answered in the negative.  Respondent failed to
indicate the criterion for mastery and/or evaluation procedures
for six short-term objectives.  Respondent has failed to comply
with the procedural requirements of the IDEA, as indicated; the
other procedural requirements have been met.

68. The second part of the inquiry stated in Rowley, supra,
is also answered in the negative.  Petitioner's IEP for the
2000-2001 school year as a whole is not reasonably calculated to
enable Petitioner to receive educational benefits.

69. In examining an IEP, great deference is given to the
educators who develop the IEP.  Todd, at 1581.  However, no
deference is due a school district when the district fails to
consider what benefit a handicapped child would receive from
education in a regular classroom with appropriate supplemental
aids and services.  Greer, at 698.

70. First, Petitioner's IEP fails to address or incorporate
the fifth grade curriculum.  Petitioner contends that the general
curriculum at the specific grade level should be considered;
whereas, Respondent contends that specific grade level should not
be considered.  The specific grade level should be considered.
In Greer, supra, the court did not examine only the general
education curriculum but examined the general education
curriculum at the disabled child's specific grade level to

23

determine if the school district modified the curriculum to accommodate the child in the regular class room.   _Greer_, at 698.

71.   In the case _sub judice_, Respondent failed to address or incorporate the fifth grade curriculum in the development of the IEP, thereby, failing to address Petitioner's individualized needs as to the fifth-grade curriculum.   Respondent failed to consider what benefit Petitioner would receive from education in a regular fifth-grade classroom with appropriate supplemental aids and services.   Even though Respondent demonstrated that Petitioner progressed in the general education curriculum, such progress does not negate or erase the requirement that Petitioner's IEP should have addressed the general education curriculum at the fifth-grade level.

72.   Second, even though Petitioner's IEP provides for the goals of improving written communication skills on a computer and functional life skills, the goals should be more specific to meet Petitioner's individualized needs.

73.   Third, at the IEP meeting on September 18, 2000, Respondent should have considered goals other than academic goals in developing the IEP.

74.   Lastly, Respondent failed to provide for Petitioner's inclusion beyond physical presence in the fifth grade classroom. The IDEA in 20 U.S.C. Section 1412, addresses mainstreaming or placement in the least restrictive environment of handicapped

children in public schools that receive public funding by

requiring schools to establish certain procedures and provides in

pertinent part:

> (a) In general
> A State is eligible for assistance under this
> subchapter for a fiscal year if the State
> demonstrates to the satisfaction of the
> Secretary that the State has in effect
> policies and procedures to ensure that it
> meets each of the following conditions:
>
>          *   *   *
>
> (5)  Least restrictive environment
> (A)  In general
> To the maximum extent appropriate, children
> with disabilities, including children in
> public or private institutions or other care
> facilities, are educated with children who
> are not disabled, and special classes,
> separate schooling, or other removal of
> children with disabilities from the regular
> educational environment occurs only when the
> nature or severity of the disability of a
> child is such that education in regular
> classes with the use of supplementary aids
> and services cannot be achieved
> satisfactorily.

75.   The IDEA further provides at 20 U.S.C. Section

1414(d)(1)(A)(iii)and (iv), that the IEP address and provide for

the placing of handicapped children in the least restrictive

environment.

76.   Petitioner's 2000-2001 IEP indicates that she was to be

placed in the regular education class 100 percent of the time and

in this respect, Petitioner's IEP complied with the IDEA.

77. When determining the appropriateness of inclusion, both academic and non-academic benefits should be considered. Sacramento City Unified School District, Board of Education v. Holland, 14 F.3d 1398 (9th Cir. 1994).

78. Petitioner was provided limited opportunities to interact at the activity level, the social level, the content level, and the extra-class level. The opportunities should be greater.

79. As to progress reports, no documented teacher observations were made by Petitioner's general education teacher and speech pathologist and the teacher's aide. As a result, no objective criteria for evaluating Petitioner's progress existed. Consequently, even though the progress reports indicate some progress, they fail to have documentation in support thereof. Moreover, no progress can be shown using the criteria established for demonstrating progress. Since no progress can be shown, Respondent was unable to provide Petitioner's mother with adequate progress reports as required in Petitioner's IEP.

80. The IDEA requires that the implementation of the IEP "must" be "as soon as possible" following the meeting. 34 C.F.R. Section 300.342(b)(2).

81. Petitioner's IEP developed on September 18, 2000, provided for assistive technology referral. The assistive technology referral was not forwarded to the Area AT Specialist

until March 13, 2001, almost six months after the request by
Petitioner's mother for the referral.  There was an undue delay
in providing Petitioner with assistive technology.

### CONCLUSION

Based on the foregoing Findings of Fact and Conclusions of
Law, it is

ORDERED that:

1.  The IEP of September 18, 2000, fails to provide S. Z.
with a FAPE and is not appropriate.  Broward County School Board
and S. Z.'s mother must meet and develop an IEP consistent with
this Final Order.

2.  Evaluation procedures for the short-term objectives
developed for the annual goals must be in compliance with the IEP
developed.

3.  Broward County School Board shall provide S. Z.'s mother
with progress reports of S. Z.'s annual goals and short-term
objectives.

4.  Broward County School Board shall complete, without
delay, the process for the assistive technology referral.

5.  Broward County School Board shall provide S. Z.'s mother
with a list of computer programs that S. Z. uses at school.

DONE AND ORDERED this _6th_ day of September, 2001, in

Tallahassee, Leon County, Florida.

_Errol H. Powell_
ERROL H. POWELL
Administrative Law Judge
Division of Administrative Hearings
The DeSoto Building
1230 Apalachee Parkway
Tallahassee, Florida  32399-3060
(850) 488-9675   SUNCOM 278-9675
Fax Filing (850) 921-6847

Filed with the Clerk of the
Division of Administrative Hearings
this _6th_ day of September, 2001.


ENDNOTES

1/  Petitioner's expert witness was more credible than
Respondent's expert witness regarding academic/educational
issues.  However, Respondent's expert witness was more credible
regarding social skills and life skills issues.

2/  The parties disagree as to what is the general education
curriculum.  Petitioner asserts that the general education
curriculum is at the specific grade level.  Respondent asserts
that the general curriculum is not at any specific grade level.

3/  Respondent's expert recommends that, in _future_ IEPs,
Respondent should examine goals other than academic goals for
Petitioner.

4/  See Endnote 1.


COPIES FURNISHED:

Stephen M. Teplin, Esquire
Alexis Yarbrough, Esquire
110 Southeast Sixth Street, 15th Floor
Fort Lauderdale, Florida  33301

Edward J. Marko, Esquire
Broward County School Board
600 Southeast Third Avenue, 11th Floor
Fort Lauderdale, Florida  33301

Iris Anderson, Program Specialist
Procedural Safeguards
Department of Education
325 West Gaines Street, Suite 614
Tallahassee, Florida  32399-0400

Honorable Charlie Crist, Commissioner
Department of Education
The Capital, Plaza Level 08
Tallahassee, Florida  32399-0400

Dr. Frank L. Till, Jr., Superintendent
School Board of Broward County
600 S. E. Third Avenue
Fort Lauderdale, Florida  33301-3125


### NOTICE OF RIGHT TO SEEK JUDICIAL RELIEF

This decision and its findings are final, unless an adversely affected party:

> a) brings a civil action within 30 days in the appropriate federal district court pursuant to Section 1415(i)(2)(A) of the Individuals with Disabilities Education Act (IDEA); [Federal court relief is not available under IDEA for students whose only exceptionality is "gifted"] or
> b) brings a civil action within 30 days in the appropriate state circuit court pursuant to Section 1415(i)(2)(A) of the IDEA and Section 230.23(4)(m)5, Florida Statutes; or
> c) files an appeal within 30 days in the appropriate state district court of appeal pursuant to Sections 230.23(4)(m)5 and 120.68, Florida Statutes.

(Rev 12/96)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**01-7579**

**CIV-FERGUSON**

## I.(a) PLAINTIFFS

The School Board of Broward County, Florida

## DEFENDANTS

S.Z., a minor by and through her Parent, M.Z.

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF  Broward
(EXCEPT IN U S PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  Broward
(IN U S PLAINTIFF CASES ONLY)

NOTE   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

CA# A 0:01 CV 7579 Ferguson
Snow

**(c)** ATTORNEYS (FIRM NAME ADDRESS AND TELEPHONE NUMBER)
Edward J. Marko, Esq.   954-765-8866
600 SE 3rd Ave, 11th Floor
Fort Lauderdale, Florida

ATTORNEYS (IF KNOWN)

MAGISTRATE JUDGE
SNOW

**(d)** CIRCLE COUNTY WHERE ACTION AROSE   DADE, MONROE, (BROWARD,) PALM BEACH, MARTIN, ST LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN X IN ONE BOX ONLY)

- □ 1 U S Government Plaintiff
- ☒ 3 Federal Question (U S Government Not a Party)
- □ 2 U S Government Defendant
- □ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN X IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business in This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place of Business in Another State | □ 5 | □ 5 |
| Citizen or Subject of a Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

Appeal from Final Order DOAH 00-4344E

- □ 1 Original Proceeding
- □ 2 Removed from State Court
- □ 3 Remanded from Appellate Court
- □ 4 Reinstated or Reopened
- □ 5 Transferred from another district (specify)
- □ 6 Multidistrict Litigation
- □ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | A TORTS | | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| □ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | B□ 610 Agriculture | □ 422 Appeal 28 USC 158 | □ 400 State Reapportionment |
| □ 120 Marine | □ 310 Airplane | □ 362 Personal Injury - Med Malpractice | B□ 620 Other Food & Drug | □ 423 Withdrawal 28 USC 157 | □ 410 Antitrust |
| □ 130 Miller Act | □ 315 Airplane Product Liability | □ 365 Personal Injury - Product Liability | B□ 625 Drug Related Seizure of Property 21 USC 881 | | □ 430 Banks and Banking |
| □ 140 Negotiable Instrument | □ 320 Assault, Libel & Slander | | B□ 630 Liquor Laws | | B□ 450 Commerce/ICC Rates/etc |
| □ 150 Recovery of Overpayment & Enforcement of Judgment | □ 330 Federal Employers Liability | □ 368 Asbestos Personal Injury Product Liability | B□ 640 R R & Truck | **A PROPERTY RIGHTS** | □ 460 Deportation |
| B□ 151 Medicare Act | | | B□ 650 Airline Regs | □ 820 Copyrights | □ 470 Racketeer Influenced and Corrupt Organizations |
| B□ 152 Recovery of Defaulted Student Loans (Excl Veterans) | □ 340 Marine | **PERSONAL PROPERTY** | B□ 660 Occupational Safety/Health | □ 830 Patent | □ 810 Selective Service |
| | □ 345 Marine Product Liability | □ 370 Other Fraud | B□ 690 Other | □ 840 Trademark | □ 850 Securities/Commodities/Exchange |
| B□ 153 Recovery of Overpayment of Veteran's Benefits | □ 350 Motor Vehicle | □ 371 Truth in Lending | **A LABOR** | **B SOCIAL SECURITY** | □ 875 Customer Challenge 12 USC 3410 |
| □ 160 Stockholders Suits | □ 355 Motor Vehicle Product Liability | □ 380 Other Personal Property Damage | □ 710 Fair Labor Standards Act | □ 861 HIA (1395ff) | □ 891 Agricultural Acts |
| □ 190 Other Contract | □ 360 Other Personal Injury | □ 385 Property Damage Product Liability | □ 720 Labor/Mgmt Relations | □ 862 Black Lung (923) | □ 892 Economic Stabilization Act |
| □ 195 Contract Product Liability | | | □ 730 Labor/Mgmt Reporting & Disclosure Act | □ 863 DIWC/DIWW (405(g)) | □ 893 Environmental Matters |
| | | | | □ 864 SSID Title XVI | □ 894 Energy Allocation Act |
| **A REAL PROPERTY** | **A CIVIL RIGHTS** | **PRISONER PETITIONS** | □ 740 Railway Labor Act | □ 865 RSI (405(g)) | □ 895 Freedom of Information Act |
| □ 210 Land Condemnation | □ 441 Voting | B□ 510 Motions to Vacate Sentence | □ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | □ 900 Appeal of Fee Determination Under Equal Access to Justice |
| □ 220 Foreclosure | □ 442 Employment | **HABEAS CORPUS** | □ 791 Empl Ret Inc Security Act | A□ 870 Taxes (U S Plaintiff or Defendant) | □ 950 Constitutionality of State Statutes |
| □ 230 Rent Lease & Ejectment | □ 443 Housing/ Accommodations | B□ 530 General | | A□ 871 IRS - Third Party 26 USC 7609 | □ 890 Other Statutory Actions |
| □ 240 Torts to Land | □ 444 Welfare | A□ 535 Death Penalty | | A OR B | |
| □ 245 Tort Product Liability | ☒ 440 Other Civil Rights | B□ 540 Mandamus & Other | | | |
| □ 290 All Other Real Property | | B□ 550 Civil Rights | | | |
| | | B□ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION
(CITE THE U S CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Individuals with Disabilities Education Act, 20 U.S.C. Section 1400 ("IDEA")

LENGTH OF TRIAL
via 3 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
□ UNDER FR C P 23

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:   □ YES   ☒ NO

## VIII. RELATED CASE(S) IF ANY   (See instructions)

JUDGE Errol H. Powell, Law Judge
Administrative
DOCKET NUMBER 00-4344E
DOAH Case No.

DATE

SIGNATURE OF ATTORNEY OF RECORD
[signature]

FOR OFFICE USE ONLY

RECEIPT # 533647   AMOUNT 150.00   APPLYING IFP 10/9/01   JUDGE